FILED
U.S. DISTRICT COURT

2012 MAR -1 A 11: 22

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

Keven J. Stratton [6805]
Duane L. Ostler [6298]
1313 East 800 North
Orem, Utah 84097
Telephone (801) 225-3570
Facsimile (435) 224-5942
keven@strattonlawgroup.com
duane@strattonlawgroup.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

| | |
|---|---|
| ILLENS DORT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ADOBE SYSTEMS, INC., a Delaware Corporation,<br><br>Defendant. | **COMPLAINT and JURY DEMAND**<br><br>Case: 2:12-cv-00220<br>Assigned To : Nuffer, David<br>Assign. Date : 02/28/2012<br>Description: Dort v. Adobe Systems |

Plaintiff Illens Dort hereby complains against Adobe Systems, Inc. as follows:

1. Plaintiff Illens Dort is an individual residing in Utah County, State of Utah. Plaintiff was born in Haiti and is black, and is a member of a protected class.

2. Defendant is a Delaware Corporation, doing business in the state of Utah, and has far in excess of 500 employees nationwide. Plaintiff is a former employee of Defendant.

3. This Complaint is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination and retaliation.

4. Jurisdiction is conferred on this court by 42 U.S.C. §2000e(5). Equitable and other relief are also sought under 42 U.S.C. §2000e(5)(g). Jurisdiction is also based on 28 U.S.C. 1331, 1343 and 42 U.S.C. §§ 1981 et seq.

5. Plaintiff was employed by Defendant at its Orem, Utah location. Plaintiff became an employee of Defendant in November, 2009 when it acquired a business known as Omniture. Prior to that, Plaintiff had worked since February 2008 as an Account Manager for Omniture.

6. Prior to the takeover, Plaintiff had serviced approximately 40 clients on a continuous basis. After the takeover, Defendant doubled the number of clients Plaintiff was expected to service to approximately 80. All other members of Plaintiff's team also experienced a similar increase in the number of clients they were expected to service. Plaintiff has made a good faith effort to properly service his clients, and has done so remarkably well, in spite of the heavy work load that the additional clients have created.

7. In January, 2010, Andy Campos became Plaintiff's supervisor. From the time Andy became Plaintiff's manager, he made light of Plaintiff's mild accent. Although English is not Plaintiff's native tongue, Plaintiff's knowledge of English and ability to communicate is exceptional.

8. Andy did not always treat Plaintiff fairly. For example, at one team meeting in the summer, Andy told Plaintiff to 'shut up.' He made no similar request to any other team member. Because of the negative, racially charged environment on Andy's team, a Hawaiian member of the team requested to be moved to another job within Adobe, even if the job had fewer work hours.

9. At a subsequent team lunch in July, 2010, Andy had been responsible for ordering the meals of each person present. When the meals were delivered, every one received one except Plaintiff. After a meal had been quickly ordered, the Hawaiian team member (who had not yet been transferred to a new team) asked Andy if his failure to order the meal for the Plaintiff with the others had been racially motivated. Andy's response was dripping with racial prejudice and sarcasm: 'Look at you talking about colored people!'

10. In early August, 2010, Plaintiff was reassigned to the team of Christian Ridge. Andy and Christian are friends, and often communicate and meet with each other. From the beginning, Christian's treatment of Plaintiff was not the same as other employees. Christian would sometimes ignore Plaintiff when Plaintiff attempted to communicate with him.

11. On September 2, 2010, Christian sent Plaintiff an email criticizing Plaintiff's email communications. Although Plaintiff's emails were no different than his fellow team members, Christian did not send a similar email to any other member of the team about how to properly send an email.

12. The tone of Christian's email was extremely condescending, as if he were addressing a school child unfamiliar with how to send an email. It must be remembered that by this time Plaintiff had worked for Adobe and Omniture for several years, and had sent thousands of emails, none of which were object to. Christian's email was clearly an effort to demean Plaintiff.

13. Plaintiff immediately notified an HR representative and copied Christian's VP (Steve Dixon) about the email, noting that 'Management has picked on my accent before and

made fun of my color in front of other employees. I [have] tried to tolerate it.' Dixon acknowledged the demeaning nature of Christian's email, and apologized for it. He informed Plaintiff a member of HR would get with him shortly. The HR representative contacted Plaintiff a short time later, and promised to review the matter and get back with Plaintiff about it. However, Plaintiff never heard back from her on the matter.

14. After the September incident, Christian retaliated against Plaintiff for his having brought the racially motivated September email to the attention of the VP and HR. Although there had been no problems with Plaintiff's work before, now Christian began criticizing Plaintiff's work performance, stating that Plaintiff's performance was somehow substandard. However, Plaintiff has always maintained the highest work standards. Indeed, when Plaintiff was with Omniture he was given some stock options due to his being in the top 10% of performers for the company.

15. Plaintiff continued to perform at the quality level of work that he has always pursued, notwithstanding Christian's unfounded criticisms. Interestingly, Christian did not criticize his other employees the same, although their work was no different than Plaintiff's. Accordingly, Christian engaged in disparate treatment of Plaintiff.

16. In October, Christian brought to Plaintiff's attention some customer complaints, supposedly against Plaintiff. Plaintiff pointed out that these complaints were due to the actions of other employees and not any failing by Plaintiff, and further noted that the number of these complaints was typical of the number of complaints against other members on Plaintiff's team because of the heavy work load they all carried. Notwithstanding Christian's knowledge of this,

he continued to assert that Plaintiff's work was somehow substandard, using these client complaints as support for the claim.

17. On November 11, 2010, Christian notified Plaintiff that Plaintiff was on 'verbal warning,' the first step in disciplinary action taken by Defendant pursuant to its standardized discipline procedure. The verbal warning outlined some areas for Plaintiff to work on, including to 'ensure your email communication is thorough,' to send Christian a cc of some client communications, and to take some online training. Christian arranged for weekly meetings to monitor progress.

18. Plaintiff continued to provide quality work for Defendant, and fulfilled all of the requirements of Christian's verbal warning. However, Christian continued to express dissatisfaction with Plaintiff's work. Christian started adding new tasks for Plaintiff to perform, many of which were busy work items that made it difficult for Plaintiff to properly service his 80 clients. Christian was fully aware that his demands sometimes pushed Plaintiff beyond what he could reasonably handle in the work time available to him. Christian did not make similar demands of any of his other employees, even though their work performance was equivalent to that of Plaintiff.

19. In late November, Christian demanded that Plaintiff prepare a presentation to give to him (Christian), as if he were a client calling in. It is important to note that this was not part of the requirements related to the verbal warning, but was something new. The presentation had to do with the 'SiteCatalyst' product details that Plaintiff's team had only recently been expected to

learn. As always, Plaintiff did as he was assigned, and prepared the presentation, even though it took significant amounts of time away from his clients to do so.

20. Plaintiff made the presentation as requested, and did very well. Apparently not satisfied for some reason, Christian scheduled another presentation for a few days later. Once again, Plaintiff did well. Christian then inexplicably scheduled the same thing a third time.

21. On the day of the third presentation, 20 minutes before it was to occur, Christian informed Plaintiff for the first time he could not use any notes in giving his answers. It must be observed that the SiteCatalyst program is very complex, and account managers such as Plaintiff were *expected* to use notes when answering client questions about it. Christian then proceeded to ask 12 detailed and largely subjective questions about the product. The questions were so detailed that Christian was compelled to use notes himself in order to frame the questions. Many of the questions were so subjective they did not have a right or wrong answer. These were not standardized questions, but questions that Christian created on his own.

22. Plaintiff did his best to answer the questions under the circumstances, and answered almost all of them correctly. Most of the members on his team would not have done as well. Although the answers Plaintiff provided were satisfactory under the circumstances, Christian somehow determined that Plaintiff had missed 6 out of the 12 questions. Significantly, no one supervised Christian's administration of this test, or has ever questioned it.

23. After this test, Christian indicated to Plaintiff that he intended to put him on a 'Corrective Action Plan' (CAP), due to alleged poor work performance. None of Plaintiff's co-workers were placed on a CAP.

24. Christian provided Plaintiff with a written CAP on January 5, 2011. The CAP alleged that Christian had 'serious concerns' about Plaintiff's work, but acknowledged that the concerns were based only on the client complaints (which Christian knew were due to the actions of other employees, and were a typical amount of complaints in any event), and the subjective Dec. 7 test which Christian said Plaintiff had supposedly failed.

25. The CAP required Plaintiff to make 10 time consuming presentations per week to clients, to go out of his way to find and provide his fellow employees with information that could possibly be useful to them, to study for and take a test on the highly detailed 'SiteCatalyst' product that no one else was yet required to take at that time, to cc Christian on every single client communication he sent (a tremendously time-consuming task in itself), and to give a presentation to his team members—all in addition to his already heavy work load of servicing 80 clients!

26. By this point in time, Plaintiff had already experienced over 4 months of constant false accusations of substandard work by Christian. When Plaintiff objected that the requirements of the CAP were unreasonable and could not realistically be accomplished while still properly servicing the 80 clients for which he was responsible, Christian refused to modify the CAP in any way. Plaintiff asked for at least a modification that would give him more time to prepare for and take the SiteCatalyst test, but this request was denied.

27. Notwithstanding the extremely unreasonable requirements in the CAP, and that many of the requirements were needless busywork which none of the other team members were being required to perform, Plaintiff made a good faith effort to comply with the CAP. He

Complaint
Dort v. Adobe Systems, Inc.
Page 7

scheduled to take the test on Jan. 31 and began studying for it, made his 10 client presentations for the week and performed the other tasks. However, Plaintiff immediately sought to meet with Defendant's HR representative to discuss Christian's unreasonable demands.

28. The HR representative was unavailable to meet with Plaintiff until two weeks after the CAP was issued, by which time it was half over. Upon reviewing the CAP, she acknowledged that it would be impossible for him to fulfill all of its requirements and still do his regular, required work. However, the HR representative was unable or unwilling to do anything to help Plaintiff. She claimed that she was unable to arrange for him to be moved to a different department as he requested, or to decrease the CAP requirements to an acceptable level.

29. Instead, 3 ½ weeks into the CAP, the HR representative presented Plaintiff with a severance package of two months' pay, provided he signed a form saying that he would not sue the company or make disparaging remarks about it, or discuss the severance package with anyone except his family or attorney. Plaintiff was astounded that HR was encouraging him to accept a severance package even though he was supposedly unproductive. The nature of the package looked more like a cover up. Plaintiff refused to sign it.

30. On Friday, Jan. 28, 2011, Christian told Plaintiff that he was not going to make the CAP and that his last day of work would be in one week. Plaintiff was still scheduled to take the 'SiteCatalyst' test on Monday, January 31. However, it was clear that HR and Christian had already judged him as having failed the CAP and taking the test would be pointless. Accordingly, Plaintiff did not take the exam.

31. On Feb. 11, 2011, Defendant terminated Plaintiff. One of the chief reasons given was his "inexplicable" failure to take the SiteCatalyst exam on January 31. It should be noted that no other employees were required to take the test at that time. Since then, they have all been required to take the test, after being given much more time to study for it than Plaintiff was given. It should be remembered that Plaintiff had asked for more time to prepare for and take the test, but was denied. Interestingly, of the 10 co-workers on Plaintiff's team who took the test, 8 failed. All of them continued to be employed by Adobe.

32. On May 2, 2011, Plaintiff filed charges with the Anti-Discrimination Division of the Utah Labor Commission and the Equal Employment Opportunity Commission (EEOC).

33. Plaintiff has been diligently searching for other employment, but his search so far has been unsuccessful. Accordingly, Plaintiff has suffered a significant amount of lost wages due to Defendant's discriminatory and retaliatory treatment of Plaintiff. Additionally, Plaintiff has experienced emotional distress, inconvenience, mental anguish and loss of enjoyment of life due to Defendant's actions.

34. On January 17, 2012, the EEOC issued Plaintiff with a 'Notice of Right to Sue,' a copy of which is attached hereto as Exhibit A.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII of the Civil Rights Act of 1964)

35. All other paragraphs in this Complaint are incorporated into this cause of action as if stated herein.

36. Plaintiff is a member of a protected class.

37. Plaintiff has consistently met his employer's legitimate and reasonable expectations. The alleged shortcomings in his work were fabrications and pretexts based on the subjective interpretations and unfounded, false claims of his supervisor, Christian Ridge, and were not reasonable or legitimate.

38. Defendant took a series of adverse employment actions against Plaintiff that it did not take against similarly situated employees, including but not limited to: (1) demeaning his email communications without cause; (2) placing him on verbal warning without any basis for doing so; (3) modifying and adding to his job responsibilities a number of tasks that other members of his team were not asked to do, and many of which tasks lacked relevance or importance, but which greatly increased his workload and his stress; (4) falsely accused Plaintiff of customer complaints that were not due to any action of his; (5) fabricating a test on Dec. 7, 2010, in such a way that he could not pass it, and then even though he performed better than could reasonably be expected, using the alleged test failure as justification for further adverse employment actions; (6) creating a CAP that was unreasonable and excessive, which included busy work items intended to overload Plaintiff and set him up for failure; (7) terminating Plaintiff for alleged work deficiencies which did not exist.

39. Defendant did not treat the other members of Plaintiff's team and its other employees the same as it did Plaintiff. This disparate treatment has severely damaged Plaintiff.

40. Defendant intentionally discriminated against Plaintiff on the basis of his race and national origin, causing Plaintiff substantial harm. Defendant's actions were with malice or reckless indifference to the rights of Plaintiff. Plaintiff has suffered loss of wages, emotional

distress, mental anguish and inconvenience, loss of enjoyment of life and loss of respect of co-workers due to Defendant's actions.

41. Defendant should be compelled to pay Plaintiff the damages it has caused him by its racial discrimination, including but not limited to present and future lost wages (back pay and front pay) and compensatory damages, and additionally should be compelled to pay punitive damages to Plaintiff for its egregious and inequitable actions which were undertaken with malice or reckless indifference to the rights of Plaintiff.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964)

42. All other paragraphs in this Complaint are incorporated into this cause of action as if stated herein.

43. Plaintiff brought to the attention of higher managers of Defendant, and/or to HR of Defendant, that he was being targeted for unfair treatment by his supervisor. Plaintiff made it clear that this targeting was related to his race and national origin. These communications by Plaintiff to higher managers and HR were protected activities.

44. Notwithstanding this, Defendant took a series of adverse employment actions against Plaintiff, including but not limited to an unjustified verbal warning, an unjustified and unreasonable CAP, and termination of employment, all in retaliation against Plaintiff.

45. Plaintiff has suffered loss of wages, mental anguish and inconvenience, and loss of respect of co-workers due to Defendant's retaliatory actions.

46. Defendant should be compelled to pay Plaintiff the damages it has caused him by its improper retaliation, including but not limited to present and future lost wages (back pay and front pay) and compensatory damages, and additionally should be compelled to pay punitive damages to Plaintiff for its egregious and inequitable actions which were undertaken with malice or reckless indifference to the rights of Plaintiff.

WEREFORE, Plaintiff demands judgment against Defendant as follows:

A. That Defendant pay Plaintiff the damages he has suffered due to Defendant's racial discrimination in violation of Title VII of the Civil Rights Act of 1964 including but not limited to lost wages (back pay and front pay) and compensatory and other damages; and

B. That Defendant pay Plaintiff the damages he has suffered due to Defendant's retaliation including but not limited to lost wages (back pay and front pay) and compensatory and other damages; and

C. That Defendant be compelled to pay punitive damages to Plaintiff for Defendant's egregious and inequitable actions which were undertaken with malice or reckless indifference to the rights of Plaintiff, up to the maximum amount of such damages allowed by law; and

D. That Defendant be compelled to pay Plaintiff the attorney fees and costs that Plaintiff has incurred in this matter; and

E. For such further relief as the court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury in this matter.

DATED this 24th day of February, 2012.

                           _/s/ Keven J. Stratton_
                           Keven J. Stratton
                           Duane L. Ostler
                           Attorneys for Plaintiff